## TERRITORY *v.* BAKER.

### (*Supreme Court of New Mexico.* January 29, 1887.)

1. MURDER—CHARGE—CRIMINAL CONVERSATION OF DEFENDANT WITH DECEASED'S WIFE —EVIDENCE OF SEDUCTION.

   On the trial of an indictment for murder, there is no error in giving an instruction as to the legal effect of the defendant having seduced the deceased's wife prior to the homicide, if proven, against the objection that there is no evidence in the case that tends to show such seduction, when it appears that there was testimony tending to show that defendant, while living in deceased's family, had told deceased's wife of her husband's intimacy with other women, had alienated her affections, and obtained a promise from her to marry him, a divorce being first obtained, and she had yielded herself to sexual intimacy with him.

2. SAME—SELF-DEFENSE—OMITTING TO CHARGE AS TO "GREAT BODILY HARM"—NO EVIDENCE TO WARRANT.

   The deceased attacked the defendant without weapons, shots were fired in the house, and deceased then ran out. Defendant started to follow him, firing at him as he ran, and then returned to his room, and again pursued him. Shots were then fired out of doors. The only wound found on the body which was necessarily fatal was one through the head, which must have been received while deceased was in a sitting position, the ball entering the top of the head, and passing out under the chin. This wound was so serious that deceased could not have gone from the house to where the body was found,—over 300 yards away,—after it was received. Defendant had two pistols in his room, and the shots in the house were fired with one of them. After starting to pursue deceased, he went back and got the other, and the wounds inflicted out of doors were with the second pistol. *Held,* that there was no evidence to warrant an instruction as to the law of self-defense, and it was not error prejudicial to defendant for the court, in giving such instruction, to neglect to state the defendant's right to defend himself against great bodily harm.

3. SAME—FEAR OF GREAT PERSONAL INJURY—COMP. LAWS N. M. § 692.

   The phrase "great personal injury," in Comp. Laws N. M. § 692, means something more than apprehension, however imminent, of a mere battery, not amounting to felony. In order to justify the assault and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assailed, or the infliction of some great personal injury, amounting· to a felony, if carried out, and, in addition thereto, there must be imminent danger of such design being accomplished.[1]

4. SAME—EVIDENCE NOT SUPPORTING CONVICTION OF LOWER DEGREES—HEAT OF PASSION.

   The evidence showing such facts, and instructions having been given defining murder in the first and second degrees, there was no error in not defining the lesser degrees of the crime, as there was no evidence to reduce the offense below that of murder in the second degree, nor was there error in omitting to charge as to the effect of killing in the heat of passion, the evidence showing deliberation.

5. SAME—INSTRUCTIONS REFUSED COVERED BY THOSE GIVEN—NOT APPLICABLE TO FACTS.

   It is not error to refuse instructions, covering the same ground, when the law as applicable to the facts has already been given, nor to refuse instructions not applicable to the facts.

6. SAME—REFUSAL TO CHARGE—COMP. LAWS N. M. 1884, § 2197.

   The requirement of section 2197, Comp. Laws N. M. 1884, that the judge should mark on each instruction asked "given" or "refused," has for its object to avoid any doubt as to what ones were given; and a refusal of instructions asked by writing at the bottom of the last of the pages on which they were written, "the foregoing are all refused,—some because they are embraced within those given by the court; others because they are believed to not accurately state the law,"—is a sufficient refusal.

7. SAME—EXCEPTION TO SUCH REFUSAL—WHEN TO BE TAKEN.

   An exception to such a form of refusal is not available when taken after the jury have retired.

8. WITNESS—CORROBORATION—WIFE OF DECEASED PARTICEPS CRIMINIS.

   The fact that deceased's wife had been sexually intimate with defendant, and that they had agreed to marry as soon as she could get a divorce, did not make her an accomplice of defendant, so as to prevent conviction on her uncorroborated testimony; and the charge that, "in weighing the evidence of the wife, you may consider the fact that she stands indicted for the same offense charged against the defendant, also whatever participation, if any, the evidence may prove that she had in the death of her husband, the weight to be given her evidence is for you, under all the facts in the evidence," is proper.

   [1] See note at end of case.

**9. JURY—ALIEN AS JUROR—OBJECTION AFTER VERDICT.**
Alienage of a juror is a good ground of challenge for cause; but an objection on that ground taken after verdict comes too late.

Appeal from district court, San Miguel county.
Indictment for murder.
*J. D. O'Bryan*, for appellant.    *Wm. Breeden*, Atty. Gen., for the Territory.

HENDERSON, J.    The appellant, Theodore Baker, was indicted in the district court of Colfax county for the murder of Frank S. Unruh, at the April term, 1886.    A change of venue was granted, on the application of the defendant, to San Miguel county.    The appellant was convicted of murder in the first degree, and sentenced to be hanged.    The record is very voluminous, the evidence covering many pages of transcript.    Appellant assigns nine errors in the record.    In order to reach a satisfactory conclusion, it will be necessary to give at least a fair synopsis of all the evidence offered in the case.    The facts may be stated briefly as follows: "The deceased, Frank S. Unruh, according to the testimony of the witness Cook, was acquainted with the defendant, and, for the purpose of aiding him to secure a claim upon the public lands, and for the purpose of giving him a home, sent the witness Cook to the town of Springer, where Baker, it seems, then lived, and had him conveyed to the ranch of the deceased, Unruh, where it was understood Baker should assist about the house, and aid the deceased in doing such work as might be required upon the premises, until he, the deceased, could aid him to locate a claim near by.    This was in July, 1885.    Baker continued to reside in the family of Unruh down to the date of the homicide, in December of that year.    From all the facts in the case it is quite apparent that the chief motive on the part of Unruh in inducing Baker to come to his house and make his home there was for the purpose of assistance to Baker in getting a home, and at the same time secure a location upon the public land as a ranch of his own.    Baker was not hired by Unruh, nor did he do work for him in the ordinary sense of a hired man or employe.    He was admitted into the family as a mere act of favor and friendship on the part of Unruh, from a sense of disinterested friendship and kindness.    Baker seems to have been kind and attentive to Mrs. Unruh.    He aided her in doing small chores around the house.    Unruh was a surveyor by occupation, and his business frequently called him away from home for many weeks at a time, leaving appellant, Baker, alone with Mrs. Unruh and a little child less than three years old.    The evidence shows that in a short time after Baker became an inmate of the family, he began, in a confidential way, to inform Mrs. Unruh, the wife of the deceased, of numerous acts of infidelity on the part of the deceased with women in Arizona.    He also told her repeatedly that her husband was very heartily and universally hated by the people in the country, and by these means, in a measure, undermined the confidence and affection of the wife in her husband.    A more or less confidential and intimate relationship sprang up between the appellant and the wife of the deceased, owing to the kindness manifested by appellant in doing her favors about the house and aiding her in the work.    She became attached to him and confided in him, which ripened into a criminal intimacy, in the month of September, about two months after he came into the family.    Mrs. Unruh testified that there was a promise of marriage made by the defendant before accomplishing his purpose of sexual pleasure.    The agreement and understanding, however, on the part of the wife was that the marriage should be consummated after she had procured a divorce from her husband.    It does not appear whether the defendant and the wife of the deceased agreed upon any particular course to be pursued in order to free herself from her marriage obligations to her husband, except in a general way, through the medium of a divorce.    Their criminal intimacy, although not positively known to the de-

ceased husband, was nevertheless suspected. He became jealous of the defendant, and from time to time complained of the conduct of his wife. The jealousy and suspicion of the husband were made known to the defendant, Baker, by the wife. She told Baker that her husband was watching, or would watch him. Thereupon Baker remarked that, "if he did, he would never come home alive." It is further shown in evidence by the witness Bryerle that some two or three weeks prior to the homicide, appellant, Baker, was at the house or camp of Bryerle and one Davenport. He there stated that there was trouble between himself and Unruh, and that, "if Unruh didn't behave himself, he would take a six-shooter and pound his head off." Bryerle also testified that during hay-making season, or the hauling season, he was employed by Unruh to haul hay, and was at Unruh's house every other night for two weeks; that Mrs. Unruh, the baby, Baker, and himself were all the persons usually at the house. When Unruh was there, he could tell from appearances that there was trouble between Unruh and defendant and Unruh's wife, but did not inquire the cause, for the reason that it was none of his business. He stated that it seemed to him that Baker was determined to remain at Unruh's house, whether Unruh was willing or not. On Saturday before the Monday night when the homicide took place, a quarrel occurred between Unruh and his wife. This quarrel was due to the jealousy of the deceased, and the conduct of Mrs. Unruh in relation to Baker. His feelings, however, seemed to have cooled down somewhat after going away on Sunday. On Monday afternoon the bitter feeling between the husband and wife was renewed in consequence of the husband's seeing or hearing an undertoned or whispered conversation between Baker and Mrs. Unruh. Unruh was drinking a little for the first time, as Mrs. Unruh testifies, during their married life. The wife sent down and got a bottle of home-made wine from the cellar. This bottle was quickly used up. The deceased wanted more, and went to the cellar and rolled a barrel out. About this time, Unruh, the deceased, stated to his wife, in the language of the witness Mrs. Unruh, "he intended to knock h—l out of the ranch." The defendant, Baker, had told the wife during the forenoon of the same day (Monday) that Unruh had said "he intended to kill all three of them," meaning Baker, Mrs. Unruh, and himself. This statement, however, was made before he became inflamed in any degree with wine. Being apprehensive of danger, Mrs. Unruh stated that she took her husband's pistol, a 44-caliber Colt, from the place where it was accustomed to hang, over the wash-stand in their room, and hid it under the head of the bed in their room. An hour or two before the difficulty arose, the defendant, Baker, inquired of Mrs. Unruh the whereabouts of the pistol of the deceased. She told him, and at his request gave the pistol to him, and he took it into his own room. Mrs. Unruh testified that the pistol was hid by her, and afterwards delivered into the possession of the defendant, to be put in his room where his own pistol was, for the purpose of preventing deceased getting hold of it. Just before dark defendant, Baker, went out of the house for the purpose of finding the deceased, and bringing him to his supper. He returned the first time without him. The second time both men came into the house together. By this time it was dark. Supper being upon the table, the deceased and appellant sat down, Mrs. Unruh standing at the head of the table. Deceased asked her why she didn't come to her supper. She said she didn't want any supper. He replied by saying that "as he paid for the grub, he would eat." By this time the deceased was more or less inflamed or intoxicated from the use of the wine. At the time of taking his seat at the table, he began cursing and swearing and calling Baker names, and said, among other things, that "he would cut Baker's heart out and hang it on a pole," or words to that effect. Baker got up from the table and went into his room, came back to the door opening into the dining-room and inquired of Unruh if he was referring to him, or speaking of him. Unruh

then sprang up from the table. They had a tussle in the other room, then there was a shot fired, and Unruh said: "My God, Kate, I am shot!" Baker said: "No, you are not. It is me." There were several shots fired after that, and then Unruh ran out of the house, and Baker ran after him. He (Baker) came out and got to the door, and then went back to the room, then he went out again, and just as he went out the light went out.

The following part of Mrs. Unruh's testimony will be copied as appears from the transcript: "(12) Who went back to his room? *Answer*. Baker did. (13) Did he go out of the house then? *A*. Yes, sir. (14) *The Court to Witness*. Do you say at that time the light went out? *A*. Yes, sir; and after that there were shots fired. It was not long before Baker came back and called for me to open the door. He said he was shot, and Frank was killed. (15) What occurred next? *A*. I asked him if he was sure he was killed, and he said ' Yes.' I asked him if he was going to let him lay there, and he said he daresn't move him. I said, 'You had better go and cover him up.' After he went down to cover him up, I heard two more shots fired. When he came back I asked him what he was shooting at, and he said he was shooting at a ' coyote.' He wanted me to stay there until he went to Cook's; but I would not do it, and so I went to Cook's with him. (16) How did you go over to Cook's? *A*. We went over in a wagon. (17) If you had any conversation with Baker going over there, state what it was. *A*. He told me to say there were no shots fired in the house. (18) How many shots were there fired in the house, if you recollect? *A*. I don't know how many there was. I didn't count them. I know there was two, and may be more. (19) When was it Frank called out he was shot,—after the first or second shot? *A*. After the first shot. (20) Where was your husband at that time? *A*. In Baker's room. (21) Could you tell about what position? *A*. No, sir. (22) Where was Baker at that time? *A*. They were both in the same room. (23) Did your husband have a pistol? *A*. Not that I know of. (24) Did he own a pistol? *A*. Yes, sir. (25) Did the defendant own a pistol? *A*. Yes, sir. (26) Do you know anything about where those pistols were? *A*. Yes, sir. They were both in Baker's room. (27) Do you know how they came there? *A*. Yes; I gave them to him. (28) To whom? *A*. Mr. Baker. Unruh was drunk, and I told him I was afraid, and he said give them to me, I will put them away. So I gave them to him. (29) That is, you gave them to Baker? *A*. Yes, sir. I supposed they would be safer with him than with Unruh. (30) Was that all the pistols there was in the house? *A*. No, sir; I had a smaller one. (31) Was there any other pistols there besides the three, —the two you gave Baker, and yours? *A*. No, sir. (32) Where was your pistol? *A*. Mine was in my room in the bureau drawer. (33) Do you know what the size of your pistol was? *A*. Mine was a ' 32.' (34) Was your pistol in this drawer at this time? *A*. Yes, sir. (35) Was it there during all the time of this trouble? *A*. Yes, sir. (36) Now, as near as you can recollect, how long was it after Frank cried he was shot that he run out? *A*. I couldn't say. It didn't seem very long. (37) Do you know what Baker did with the two pistols he took? *A*. No, sir; I do not. (38) Did you see him take them into his room? *A*. Yes; he took them in there. (39) How long was that before the shooting? *A*. I don't know how long it was; not more than an hour or so, if it was that. (40) Where was your husband at that time? *A*. He was out doors. (41) What was he doing out doors? *A*. I don't know what he was doing out there. He had a wine barrel out there somewheres. (42) What wine was this? *A*. Some wine I had made out of grapes. (43) When Baker got up from the table, where did he go first? *A*. He went into the room he used. (44) Is that the room where the pistols were? *A*. Yes, sir. (45) *The Court to Witness*. Was your husband and Baker both sitting at the table? *A*. Yes, sir. (46) On opposite sides of the table? *A*. Yes, sir. (47) How did the matter commence? *A*. They were sitting at the table.

(48) Your husband asked you to come to the table? *A.* Yes, sir. (49) What did you reply? *A.* I told him I didn't want any supper. (50) Then what did he say? *A.* He said: 'Damn it! you can come and get it.' I told him I didn't want any; and he said: 'I am going to have mine, if I pay for the grub that is in the house.' (51) Was supper on the table then? *A.* Yes, sir. (52) Were the men eating? *A.* Yes, sir. (53) How long had they been eating? *A.* They had just sat down. (54) After he made the remark 'he paid for the grub and was going to have his,' what next was said? *A.* He said: 'The damn s——n of a b——h! he would cut his heart out, and hang it on a pole.' (55) Had Baker in the mean time said anything? Had he spoken up, and taken your part? *A.* No, sir. (56) Had Baker said anything? *A.* No, sir. Baker went out and brought him in. Baker had gone out and brought him in the house after he had gone out. (57) That was before this, was it? *A.* Yes, sir. (58) Baker had gone out and brought him into supper? *A.* Yes, sir. (59) Had they any words about that before they sat down to supper? *A.* Not in the house. (60) Had you heard any words between them out doors? *A.* No, sir. (61) Then they came in, and both sat down? *A.* Yes, sir. (62) What remark was made that led your husband to say 'he would rip his heart out, and hang it on a pole?' *A.* There wasn't anything that I know of, unless it happened out of doors. (63) Immediately after your husband asked you to come to supper, and you declined, he began to talk about cutting Baker's heart out? *A.* He began to swear and call him names. (64) Call who names? *A.* Mr. Baker, I suppose. (65) What names did he call him? *A.* He called him a s——n of a b——h and a pimp. (66) What else? *A.* That was all I know of,—all I remember. (67) Who left the table first? *A.* Baker did. (68) What did he do? *A.* He went to his room. (69) Did he leave the table quickly? *A.* No, sir. (70) He got up from the table, and went into his room? *A.* Yes, sir. (71) Had your husband up to that time made any demonstrations that you saw there? *A.* No, sir; not that I know of. (72) Had he drawn a weapon or knife, or anything of that sort? *A.* No; he had a knife in his hand when he was pounding on the table. (73) Just a common case-knife? *A.* Yes, sir. (74) When he done that Baker got up and went into his own room? *A.* Yes, after he called him names. (75) This was in the kitchen, was it? *A.* Yes, sir. (76) Which door did Baker go to his room by,—the north or south door? *A.* He could only go to his room by one door. (77) Do you recollect the writing desk or secretary that was in Baker's room? *A.* Yes, sir. (78) Was the door that went from the kitchen into that room north or south of the desk? *A.* South of it. (79) When Baker went into his room did your husband follow him? *A.* No, sir. Baker came to the door, and asked if he meant him, and my husband sprang up from the table, and they both tussled in the other room. (80) Baker went into his room, and then came out again? *A.* Yes, sir; and stood by the door. (81) How long had he been in his room before he came back? *A.* Not very long. (82) Longer than a minute? *A.* Just a few minutes. (83) When he came back to the door did he say anything to your husband? *A.* He asked him if he meant him. (84) What did your husband say? *A.* I don't know whether he said anything to him. He jumped up from the table. (85) At that time was the table between Baker and your husband? *A.* Yes, sir. (86) Did your husband pass around the table? *A.* He was sitting right at the end, and he jumped up from the end of the table. (87) When he was sitting at the table, and Baker was standing in the door, how far were they apart? *A.* I don't know. (88) As far as across this platform? [Indicating platform about six feet wide.] *A.* Yes, about. (89) Then where did they get together, —in Baker's room or the kitchen? *A.* It must have been about the door of Baker's room. (90) Did your husband move towards the door? *A.* Yes, sir. (91) And they clinched each other? *A.* Yes, sir; and they tussled in there. (92) Were they in the door of Baker's room, or in the kitchen? *A.* They

must have commenced at the door and went on in the room. They were in the room when the shot was fired. (93) How long after they began wrestling at the door was it before you heard the shots fired? *A.* Not very long. (94) Was it a minute? *A.* Yes; I guess it was more than that. (95) Were they still wrestling? *A.* Yes. One of them fell; I don't know which one. (96) You heard a fall on the floor? *A.* Yes, sir. (97) Did you hear that fall before the shot? *A.* Yes, sir. (98) How long after the fall was it before you heard the shot? *A.* I could not say how long. (99) A second or more? *A.* Yes; I guess it was. (100) Did the shot follow immediately after the fall? *A.* It could not have been long after. (101) Then did you hear your husband cry out, or what? *A.* Yes. He said: 'My God, Kate, I am shot!' (102) Could you tell from the sound of his voice whether he was standing or lying on the floor? *A.* No, sir; I could not. (103) First they began to wrestle; you heard a sound as if somebody had fallen to the floor; then you heard a shot; then your husband cried out, ' My God, Kate, I am shot?' *A.* Yes, sir. (104) Is that the correct order of events? *A.* Yes, sir; so far as I know. (105) What next occurred,—what did Baker do? *A.* He said, 'No; he has shot me.' (106) Baker said what? *A.* 'No; he has shot me with my pistol.' (107) What did Unruh say? *A.* He didn't say anything. He run out of the door. He came out, and went out of the kitchen door. (108) How soon did the defendant go after him? *A.* He came right after him; and, when he got to the door, he went back to his room, and then went out again. (109) Was your husband running rapidly through the kitchen? *A.* I don't know. (110) You must have observed that he did run rapidly? *A.* It didn't seem to take him long to get out. (111) As he passed through the kitchen, did he say anything? *A.* Not that I heard. (112) How far was Baker behind him? *A.* He was right to the back of him. (113) Did you see anything in Baker's hand? *A.* No, sir. (114) Did you see anything in the hands of either of them? *A.* No, sir. There was a shot right through the kitchen window. I didn't see them do it. I don't know how it was done, but there was a shot there right through the casing. (115) Was that shot fired as your husband ran out of the door? *A.* I don't know whether it was or not. It must have been. (116) Where was Baker when that shot was fired? *A.* He must have been coming out of his room. I don't know where he stood. It went right through the casing. (117) Was your husband between him and the window at that time? *A.* Yes, sir; he was between him and the door. (118) Take the place where Baker stood when the shot was fired, and the place where your husband stood, and the place where the window was,—would your husband be about between Baker and the window? *A.* Yes, sir. (119) Was anything said when that shot was fired? *A.* No, sir. (120) Who fired that shot? *A.* I don't know. I suppose Baker must have done it."

Witness, Mrs. Unruh, further says that, as the light went out just as that shot was fired, it must have gone out just as her husband and Baker went out of the door. It further appears that defendant, Baker, pursued the deceased to the door, halted there, came back through the house, went into his room, and remained there some time, and again went out in pursuit of the deceased. Just what happened after this no eye-witness speaks of. The two men were out in the dark, some distance from the house, and alone. The wife testified that several shots were fired after Baker had gone out the second time in pursuit of her husband. They were not far from the house. The body of the deceased was found some 334 steps, the witness Cook says, from the house, in an eastwardly direction, down the arroyo, with the head lying to the east and away from the house. Deceased was lying on his right side, on his face somewhat, with three bullet holes in his body,—one entering about the stomach; another passing down through the shoulder, down the front part of the left shoulder, passing through part of the arm, going through the thigh, and lodging in the drawer leg. The witness Dr. North says the third wound was

in the left side of the head. He could not tell in which direction it went. It was powder burnt around the wound. He further testifies as follows: "(6) Do you recollect where the bullet came out? *A.* I don't know whether the bullet come out at all. This was apparently an entrance wound; and I think it came out on the jaw. The wound in the jaw was a ragged wound. I imagined it was a wound that was made from a bullet that had gone through something else before striking there. (7) Did you notice any powder burns on the head? *A.* Yes, sir; both sides of the face and the top of the head was powder burnt. (8) Now state any other wounds? *A.* There was a wound in the right arm, just above the elbow, coming out on top of the shoulder. I judged that it went in just above the elbow, and come out on the top of the shoulder. His wounds had been made some time; and it is impossible to state positively. (9) State where you thought the entrance wound was. *A.* It was just above the elbow of the right arm. There was a wound on the left side, I think, too, about the lower border of the ribs. I have forgotten whether the bullet went through or not; but I think it did. Then, there was a wound on the outer part of the thigh,—of the left thigh,—just a flesh wound. (10) Did that go through? *A.* Yes; I think so. (11) From front to back? *A.* I would not state positively. I don't remember. (12) Were any of these wounds sufficient to cause death? *A.* Not necessarily, except the wound in the head. This wound in the stomach might have been fatal. We didn't probe it, or hold a *post mortem.* (13) The wound in the head was sufficient to cause death? *A.* Yes, sir. (14) What amount of blood would escape from the head, probably? *A.* It would be pretty hard to state how much. I can't say. (15) As a physician, could you form any reasonably correct estimate? *A.* No, sir; I do not think I could. I would not want to say. (16) Did you examine the defendant as to any wounds he had? *A.* Yes, sir. (17) What wounds did he have? *A.* He had a wound in the left fore-arm, just below the elbow. (18) Where was the entrance part of that wound. *A.* The wound was from the middle of the arm upwards, coming out by the elbow. (19) What was the character of that wound,—what kind of a wound was it? *A.* It was a flesh wound. (20) A gun-shot wound? *A.* Yes, sir."

Another witness stated that deceased was powder burnt in the face; and the top of his head was burned into a crisp from the powder burn. The range of the head wound was from the top of the head coming out at the jaw. The witnesses Cook, Bryerle, Tolbert, and a Mexican, on being notified, on Monday night, a few hours after the homicide, went to Unruh's ranch, made a search, and found the body of Unruh at the place named. They describe with great particularity the nature and direction of the wounds, the appearance of the ground, the direction of blood stains from the house to the point where the body was found, and all agree in saying that there were indications close by where the body was lying indicating that a man had been sitting on the ground, and that the wound in the top of the head, coming out of the jaw, and the one entering the arm and passing down through the thigh, were inflicted while deceased was sitting upon the ground in an upright position. Mrs. Unruh also testified that when the defendant came back into the house, saying that he was wounded, and that her husband was killed, he told her to say that no shots were fired in the house, and that, in order to make it appear that no shots had been fired in the house, she removed the blood stains in Baker's room where the difficulty began. A letter is also put in evidence, written by Baker to Mrs. Unruh after he had been committed to jail, imploring her to swear favorably to him, suppressing the truth. This letter contains many damaging statements to the prisoner. From it there seems to be a conviction in his mind that, if the truth in every particular were told, he would be found guilty upon his trial. The prisoner had made efforts in divers ways to induce the woman to swear falsely, and that, as she was the only eye-witness to the tragedy, he hoped thereby to escape.

The court instructed the jury very fully and liberally as to murder in the first degree, and also instructed fully and fairly as to murder in the second degree. The defendant, however, at the time, excepted to several charges given by the court, and to the refusal of the court to give certain instructions asked by the prisoner. These exceptions are as follows:

"(1) That the judge erred in charging the jury that, if the evidence proved beyond a reasonable doubt that defendant had seduced deceased's wife, and had agreed to marry her, and that to relieve himself of deceased, and enable defendant to possess himself of the wife, defendant resolved to kill the deceased; that he deliberately thought over, and resolved to take the life of the deceased, and with premeditation proceeded to shoot and kill the deceased,—that would be sufficient as to the element of premeditation.

"(2) The judge erred in charging the jury as follows: 'If you should find from the evidence that the deceased was jealous of defendant; that he was drinking wine, and somewhat inflamed and excited, and rushed upon the defendant with a knife, dangerous to defendant's life, or likely to be used in such a way by deceased as to greatly endanger his life,—what the defendant might lawfully do would depend upon all surroundings then present. If there was such an attack, and the defendant reasonably apprehended therefrom that his own life was in imminent danger, he might lawfully kill his assailant, and would not in doing so, under such circumstances, be guilty of any offense whatever.'

"(3) The judge erred in charging the jury as follows: 'If the evidence proves that the defendant was guilty of having criminal sexual intercourse with deceased's wife, and that deceased either knew or suspected it, that would not justify deceased to make an attack upon defendant. If attacked by Unruh in such a fierce way as to create in the mind of the defendant the reasonable apprehension that his life was in imminent danger from such attack, the defendant would have just as much right to defend himself from such attack, even if he had before been sexually intimate with Unruh's wife, if you so find, as if he had not sustained such relations.'

"(4) The judge erred in charging the jury as follows: 'If the defendant were violently attacked by the deceased in such a way as to create in his mind the reasonable apprehension that his own life was in imminent danger, under such circumstances the defendant would not be bound to withdraw or retreat, but he might lawfully stand in his tracks and take the life of his assailant. If the deceased did make such an attack, creating such reasonable apprehension, and was killed by the defendant while resisting such an attack, defendant would stand justified and not guilty. Or if defendant was attacked by deceased violently and fiercely, so as to create in his mind the reasonable apprehension that his life was in great and immediate danger, and the parties grappled and swung into an adjoining room, and then deceased received the shot which caused his death, given by the defendant while resisting such attack, and in the reasonable apprehension that it was necessary to give the shot to protect his own life, the defendant, under such circumstances, if they exist, would not be guilty.'

"(5) The judge erred in charging the jury as follows: 'If the defendant and deceased were struggling together in Baker's room, under such circumstances as that Baker was acting rightfully in his own defense, and the evidence further proves that the deceased quit the struggle, and retreated out of the house, and away from the defendant, the law, under such circumstances, would deny the right to the defendant to follow up the deceased for the purpose of himself taking the affirmative, and attacking deceased with a dangerous weapon; and if the evidence proves that there was such a retreat by the deceased, and that he was followed up by the defendant for the purpose of taking the deceased's life, and found and attacked by defendant, and shot to death, such shooting would be unlawful and unjustifiable.'

"(6) The judge erred in charging the jury as follows: ' If deceased violently and fiercely attacked the defendant, and they grappled and struggled together, and the attack was such that defendant reasonably apprehended his life therefrom to be in imminent danger, he might, under such circumstances, lawfully shoot, then and there, the deceased, and stand guiltless; and if he did so under such circumstances, he would not be guilty; but if the evidence proves such an attack and such a struggle, and further proves that the deceased became released from such struggle and fled from the defendant for the purpose of avoiding further contest, and ran through the kitchen and out of the house and away from the defendant, under such circumstances, if they are proven, the defendant, if he desisted from pursuit, would not have the legal right to again take up the pursuit, and follow up deceased, and there shoot and kill him.'

"(7) The judge erred in charging the jury as follows: ' In weighing the evidence of Mrs. Unruh, you may consider the fact that she stands indicted for the same offense charged against the defendant; also, whatever participation, if any, the evidence may prove that she had in the death of her husband. The weight to be given her evidence is for you, under all the facts in the evidence.'

"(8) The judge erred in refusing to charge the jury as requested in the points of defendant which are referred to and made a part of this reason.

"(9) That the verdict was against the weight of the evidence.

"And the defendant then and there by his counsel asked the court to give the following instructions: ' To convict of murder in the first degree, the jury must be satisfied that there was premeditation on the part of the defendant to kill the decedent. The death of the decedent must have been the object of defendant, and that death must have been effected with the willful design of the defendant, before the jury can convict of murder in the first degree. Under the evidence the jury must find that the defendant provoked or brought about the struggle that ended in the death of decedent, and that such provocation or bringing about was a part of a plan to effect death; but not, if the jury find from the evidence that the struggle between defendant and deceased was not provoked or brought about by Baker, but was begun by the deceased, in a manner and with such threats and actions as might induce an apprehension on the part of defendant, either of death or great bodily injury. The resistance of defendant, and its result, was justifiable, if the jury believe that there was no premeditation to kill Unruh before the latter had made the attack upon Baker; but that after the struggle began in the manner described by the evidence, and that hot blood was aroused, the killing of Unruh then was not murder in the first degree. It being a conceded fact in the case that Mrs. Unruh is under indictment for killing of her husband, and that her testimony is being used by the territory in the case against her *particeps criminis*, it would be most unsafe for the jury to give credit to her testimony, unless it is corroborated; and this corroboration should extend, not only to an identity of the prisoner, and the location and surroundings where the alleged offense took place, but to every material fact that goes to prove guilt. If the jury believe that Unruh was jealous of defendant, either for cause or without, but did not apprehend the defendant in the act of criminal intimacy with the wife of deceased, then he had no right to attack Baker; and if he did make an attack on Baker in a manner that induced or was calculated to induce a belief that great bodily harm was intended, Baker was justified in resisting to the extent of protecting his own life or preventing great bodily harm. Before the jury can adopt the theory of the prosecution that after the struggle was over Baker came to the house, and then went out after a lapse of some time, and finding Unruh not yet dead, fired two more shots at him, so as to kill Unruh, they must be satisfied from the evidence that Unruh was left at the *corral* alive, and that the defendant fired the alleged shots at him after he had gone back to the *corral*, and that those shots produced death.' But the court then and

there refused to give these instructions to the jury, to which decision of the court, in refusing to give the same and each of them to the jury, the defendant then and there by his counsel excepted."

In addition to the foregoing exceptions taken at the time of the trial the defendant excepted to the failure of the court to mark the instructions given, "as given," and those refused, "as refused," and the court in lieu thereof made this indorsement on the instructions refused: "The foregoing are all refused,—some because they are embraced within those given by the court; others because they are believed not to accurately state the law." Counsel for defendant never asked further to examine the indorsements on the points thus presented, or objected or excepted to any action of the court respecting the manner in which its action was indorsed on or omitted from the points until after the jury had retired, when defendant's counsel asked what the court did with said points, and the court remarked: "So far as they were the law, they were included in the court's instructions; that the counsel for defendant had full opportunity to ascertain and object to the action of the court before the jury retired, in the particular named."

Subsequent to the trial, it appeared to the court, from his examination in open court of this case, that one of the members of the jury, Jose Perida, at the time of his being impaneled and during the trial on the said jury, was not a citizen of the United States; which fact was not known to the defendant or his counsel at the time the said juror was sworn as a juror in said case; all of which was brought to the attention of the court by the following affidavit, which was filed in support of this particular reason for a new trial.

"San Miguel County, Territory of New Mexico.

"*Territory of New Mexico* v. *Theodore Baker.*

"J. D. O'Bryan, being duly sworn, doth depose and say that he was assigned as counsel for Theodore Baker, and that on the trial the jurors were all sworn as to their qualifications, and it appearing that Jose Perida was duly qualified, and no objection appearing from his answers to questions propounded by deponent, he was accepted as a juror in the above cause; that it was not known to the said defendant, as deponent believes, nor was it known to this affiant, that the said Perida was disqualified from being a juror by reason of his being an alien; but that, since the jury rendered their verdict, it has come to the knowledge of this affiant, by an examination under oath of the said Perida in open court, that he was and is an alien, and disqualified from acting as a juror under the laws of New Mexico; that the fact as above stated did not come to the knowledge of affiant until after the trial as aforesaid.

[Signed] "J. D. O'BRYAN.

"Sworn and subscribed to before me this first day of September, 1886.
"R. M. JOHNSON, Clerk."

When the jury was sworn on the *voir dire*, no question was asked the juror Perida as to his citizenship, and at that time he made no answer on that point, but was accepted and sworn without interrogation in this proceeding as to his citizenship; but, at the opening of court for the term, the presiding judge read to the jury for the term section 580, Comp. Laws, and asked them if they were all qualified jurors under said section, and receiving an affirmative response, the jury was impaneled as the regular jury for the term, and among them the juror Perida. Whereupon motion for a new trial was made for the additional reason of the disqualification of the said juror Jose Perida; which said motion, after argument, was overruled by the court. The several exceptions were in due form taken and saved at the time during the progress of the trial. After the motion for a new trial was overruled, defendant had his bill of exceptions signed, and the cause comes here by appeal.

The first error alleged is to the giving of that portion of the charge by the court in relation to the seduction of the wife by the defendant. Counsel for appellant insists that there is no proof in the record upon which that charge could be predicated; that the instruction was abstract and misleading, and, for that reason, erroneous, and cites Hill. New Trials, 263; *Harrison* v. *Thompson*, 9 Ga. 310; *Dunlap* v. *Robinson*, 28 Ala. 100; *Armistead* v. *Brooke*, 18 Ark. 521; *Haney* v. *Marshall*, 9 Md. 194; *Henderson* v. *State*, 49 Ala. 20; *Case* v. *Illinois C. R. R.*, 38 Iowa, 581; *Jones* v. *Jones*, 57 Mo. 138. It may be conceded that where there is no evidence relating to the alleged facts there should be no instructions. *State* v. *Ware*, 62 Mo. 597; *Roach* v. *State*, 77 Ill. 25. The evidence set out in this record certainly proves that the appellant, by the means heretofore stated, acquired the confidence of the deceased's wife. It also proves that the information, whether true or false, with reference to the intimacy on the part of the husband with other women in Arizona tended very strongly to alienate the wife's feeling from her husband. That those things combined operated most powerfully upon the mind of the wife of the deceased to yield her confidence to the defendant, and her person to his sexual embrace, is unmistakable. Whether there was any evidence proving seduction must depend upon the sense in which the term seduction is used in the instruction. We think that the facts proven show in the mind of the wife, a belief that the defendant was a better friend to her than her husband, and that he ultimately, in consequence of the yielding on her part, would marry her. She was certainly seduced, if it be not a misnomer to call the yielding of the wife to sexual intimacy with a man other than her husband seduction at all. Therefore there was evidence sufficient upon which to predicate that instruction. It was neither abstract nor misleading, although it was not necessary to point out a particular motive on the part of the defendant inducing him to take the life of Unruh.

The second, third, and fourth exceptions are based upon alleged error, because by the terms of the charge the jury are restricted to the belief on the part of defendant of imminent danger to his life as the only justification for the killing; the contention being that, if the defendant had reasonable apprehension of great bodily harm, that would justify resistance, even to the death of the decedent. Appellant relies upon section 692, Comp. Laws N. M. That section (692) is in the following words: "Such homicide is also justifiable when committed by any person in either of the following cases: *First*, when resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling-house in which such person shall be; *second*, when committed in the lawful defense of such person, or of his or her husband, wife, parent, brother, child, master, mistress, or servant, when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished; and, *third*, when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or lawfully suppressing any riot, or in lawfully keeping and preserving the peace." Whether or not this section of the statute can be appealed to, or invoked in aid of, the defense of appellant will depend entirely upon the facts as disclosed in the transcript. They are in substance as follows: The deceased and appellant were sitting at the table, deceased using rough language, and calling defendant names. Defendant got up from the table, went into his room, where he knew two pistols to be,—that of the deceased as well as his own. He came back to the door opening into the dining-room, and inquired of deceased if his reference or allusions were to him. At this time deceased had a small case-knife in his hand, and was pounding the table with the point of it, and he, without replying to the defendant, quickly arose from the table, but whether with or without the knife in his hand, is not shown positively either way. Deceased and defendant clinched at the doorway, and in that

condition swung into appellant's room, where they scuffled for some little time. Then a fall was heard, a shot fired, and an exclamation made by deceased: "My God, Kate, I am shot!" appellant exclaiming: "No; I am shot." Several shots were fired, when deceased, freeing himself from the grip or presence of defendant, ran to the door, coming out through the dining-room with appellant in close pursuit of him. The deceased escaped through the outer door, and ran in the direction of the *corral*. As deceased was nearing the doorway, a shot was fired in the direction of deceased, which the wife says was fired by defendant, and took effect near by where deceased was at the time of the firing. Defendant pursued deceased to the door, when the light was blown out. The defendant then stopped, and returned to his room, and remained in there some little time, came out again and renewed the pursuit of the deceased, pursuing him until he killed him, over 300 yards from the house. The knife was found the next day in the plate where deceased sat eating his supper, bent at the point. This was a blunt-pointed common case-knife, and looked as though it had been bent by thrusting it against a hard substance. For the reason that the knife was found in the place where it was last positively known to have been when in use by the deceased while at supper, and the further fact that deceased was never again within the dining-room except as he was fleeing and defendant pursuing him, and in no condition of mind to be thoughtful enough to put the knife again on the plate, incline us to the belief that the deceased had no weapon whatever, not even the case-knife referred to, when the collision first took place between the parties. If this be true, there was nothing in the circumstances attending the assault from Unruh indicating either the purpose or ability on his part to take the life of the defendant, or to do him great personal injury. There was absolutely nothing to create rational belief on the part of Baker that he was in imminent danger of his life, or that he would suffer great personal injury from Unruh, within the meaning of the statute, so as to justify the appellant in killing him. The phrase "great personal injury," as used in the statute, means something more than apprehension, however imminent, of a mere battery, not amounting to a felony. In order to justify the assault, and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assailed, or the infliction of some great personal injury, amounting to a felony, if carried out; and, in addition thereto, there must be imminent danger of such design being accomplished. In this case there was nothing in the manner of the deceased to indicate an intention to do more than to visit upon him chastisement with his fist, and the usual result in such instances is nothing more than an assault and battery, not amounting to a felony. There was nothing showing, or even tending to show, that deceased had provided himself with a weapon of any kind with which he could have slain the defendant. He was wholly unarmed, if our view of the testimony be a correct one, and, at most, he had a dull-pointed, small case-knife, with which it would have been difficult to have inflicted a mortal wound upon defendant, had he made no resistance whatever. It was neither a cutting nor a stabbing instrument for purposes of that kind. The knife was put in evidence, and has been sent up with the transcript for our inspection. From such inspection we are satisfied that whatever might have been the purpose or intention on the part of the deceased when he grappled with the defendant, it was not coupled with the present ability at the time to carry any murderous design into effect; so that the testimony, viewed in any light, even the most favorable for the prisoner, shows no legal justification on his part in his assaulting deceased with a pistol in the room at the time the struggle first took place. It is not shown that deceased had a pistol at any time, either in the room or after he escaped from the house. The court instructed the jury, as we have seen, that, if the

deceased made a sudden, violent, and fierce assault upon the defendant in the house with the knife above spoken of, and that the defendant believed that his life was in imminent danger by reason of such assault made by deceased, that, notwithstanding he had before that time been criminally intimate with the wife of deceased, he would nevertheless be justifiable, if the jury further find that deceased died from the shot inflicted at that time. The court below was more liberal in its instructions to the jury on the subject of self-defense than defendant had any right to demand; and, although such instructions did not go to the full extent permitted by our statute in not submitting to them the question as to whether there was reason to apprehend a design on the part of the deceased to do the defendant great personal injury, and that there was imminent danger of such design being accomplished, the defendant cannot be prejudiced by such instruction, for the reason that the facts proven in the case did not warrant an instruction on the subject of self-defense at all. This is certainly true when it is made apparent, from a consideration of all the evidence in the record, that the mortal shot from which Unruh died was not inflicted in the house. The jury were permitted to ascertain and determine, under the instructions given by the court, whether or not the deceased came to his death by reason of a shot or shots fired in the house, and that, if deceased did die from a wound or wounds so received, they were instructed to acquit the defendant. Had the combat commenced and ended entirely in the house, and the death of Unruh had ensued from pistol shots or other injuries inflicted by defendant, it might have been proper to have framed other and different instructions covering some of the lower degrees of murder defined by our statute. In that event, the jury would have been permitted to have taken into account the apparently unexpected nature of the assault by Unruh, and the excitement and hot blood engendered by reason of it, for the purpose of reducing the degree or grade of the crime, and for the purpose of ascertaining whether or not there was a design on the part of the defendant to take the life of the deceased. The legal proposition contended for by appellant's counsel on the point under consideration, as a general rule of law, is admitted, but it has no application to the particular facts developed in the proofs in this case. The evidence shows that, in the first encounter, the deceased was shot by the defendant, and immediately fled; that the defendant pursued the deceased, firing upon him as he ran; this pursuit was continued to the door, when defendant stopped, returned to the room, and again renewed the pursuit, thereby becoming the aggressor, depriving himself of any claim or pretense of justification. It is made clear by the testimony of all the witnesses that the only necessarily fatal wound found upon the person of the deceased was the shot entering on the top or side of the head of the deceased, and coming out at his jaw. This shot was fired, in the very nature of things, while the defendant was in a position immediately over the deceased, and it is not at all probable that, after having received such a wound, he could have escaped from the house and run over 300 yards before falling to the ground. Indeed, all of the evidence tends to prove most satisfactorily and conclusively that this shot was fired after the parties had left the house, and were away at some distance, and while the deceased was in a sitting posture, or lying upon the ground. It is also shown that the deceased was shot with both a "45" and a "44" caliber pistol,—with the "45" in the house, and the "44" outside,—and that the deceased was not armed at all, and certainly not while out of doors. The facts proven warrant the conclusion that defendant shot deceased in the house with his own pistol, and, after pursuing him to the door, returned to his room to secure the pistol belonging to the deceased, and then renewed the pursuit, and inflicted the death wounds with the pistol of the deceased. While the instructions complained of do not state the whole law on the subject of justifiable or excusable homicide, it was

an error without prejudice to the defendant on the facts disclosed, and no ground for a reversal of the judgment. *Territory* v. *Salazar*, 5 Pac. Rep. 462;[1] *People* v. *Ah Kong*, 49 Cal. 6; *State* v. *Murray*, 5 Pac. Rep. 55.

The fourth exception is to a part of the charge that counsel claim is obnoxious for two objections: *First*, that it omits altogether any reference to the hot blood that must have been engendered by the contest in the room of defendant, and is also silent upon the question of cooling time, which must have been present to permit premeditation; and, *secondly*, the close of the instruction is misleading, in that it simply says that such shooting would be unlawful and unjustifiable." He illustrates his proposition in this way: Suppose that the jury believed there was hot blood, and no sufficient cooling time: the shooting was certainly unlawful and unjustifiable, but was it murder in the first degree? The court gave the statutory definitions of murder in the first and second degrees in his instructions in the most ample and complete manner. In view of this contention, it is important to inquire whether or not the evidence made a case in which the defendant was entitled to an instruction on the subject of murder in any degree below that of the second. The statute defines murder in the third degree in the following terms:

"Sec. 699. The killing of a human being, without design to effect death, in heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute justifiable or excusable homicide, shall be deemed murder in the third degree.

"Sec. 700. The killing of another in the heat of passion, without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of murder in the fourth degree."

"Sec. 702. Every other killing of a human being, in any other manner, by the act, procurement, or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder of one of the degrees already defined, shall be deemed murder in the fifth degree."

The killing of deceased by the defendant, as shown by the evidence, was certainly done with a design to effect the death of the deceased; and that being true, it necessarily follows that the killing was neither murder in the third, fourth, or fifth degrees. Whatever may have been the provocation, or however intense the hot blood aroused by the combat in the house, the design of the defendant, when he pursued the deceased out of the house in the night-time, with a deadly weapon in his hand, followed him up, and inflicted a mortal wound, proves that his intent was to take the deceased's life. The court charged the jury that, if they believed that the defendant killed the deceased, and did it designedly, but without premeditation, he would be guilty of murder in the second degree, and not of murder in the first degree, as they did find. There being now no legal excuse or justification for the pursuit of the deceased, and his design being to kill, he was guilty of murder either in the first or in the second degree. The jury were told that, before they could find a premeditated design to effect the death of the deceased, they must believe from the evidence that the defendant had meditated upon, thought over, and resolved to take the life of the deceased. If the facts proved that the defendant was angered and in hot blood, and pursued and slew the deceased in consequence of such excitement and passion, it would, nevertheless, be murder under our statute either in the first or second degree, in the absence of legal justification or excuse. The jury had the right to determine whether or not the state of the prisoner's mind was such as to rob him of the premeditated purpose or design to kill. The facts certainly evince a considerable amount of deliberation on the part of the defendant in ceasing the pursuit at the door, returning to his room, and preparing himself more fully for success in the renewed pursuit of his victim. The passion was certainly not irresistible.

[1] Same case, 3 N. M. 210.

so that he was impelled to the act by reason of it. So far as heat of passion is an excuse under our statute in the commission of a homicide, the court properly gave the defendant the benefit of it. Whart. Crim. Pl. 713; *State* v. *Ross*, 29 Mo. 32; *Jones* v. *State*, 13 Tex. 168; *Johnson* v. *State*, 26 Ga. 611; *People* v. *King*, 27 Cal. 507; *People* v. *Williams*, 32 Cal. 280.

It is further objected by the appellant that the instruction of the court to the jury in regard to the effect or weight to be given the evidence of Mrs. Unruh was erroneous. The argument on that proposition is that the evidence shows that Mrs. Unruh was an accomplice with the defendant in the commission of the crime, and that the court ought to have instructed the jury that they could not convict the defendant on her uncorroborated evidence. There is no proof showing that she was an accomplice, except in so far as her criminal complicity in the design to effect the death of her husband may be inferred by reason of her relationship with the defendant, and a desire on her part to be free from the bondage of her husband. She denied that she ever contemplated the commission, either by herself or by the defendant, of the crime charged. While her conduct was of a culpable character, it cannot be said that she aided the defendant in effecting his death. After the difficulty arose, she swears that her purpose in handing her husband's pistol to the defendant was to prevent any difficulty. This may or may not have been true. Her course of conduct with the defendant may be explained in entire harmony with her declaration that she had no design or purpose to aid in any manner in the death of her husband. The fact that a wife is unfaithful to her husband, does not love him, has no disposition to promote domestic happiness with him, and is attached, and even engaged to be married, to another person, after a certain contingency shall have taken place, such as a divorce from her husband, does not necessarily impute to her a criminal intent, such as to make her an accomplice with the defendant. There is no evidence to warrant the assertion that Mrs. Unruh was an accomplice or associate of the defendant in the murder, or that she in anywise consented to or assisted in the murder; nor did she, so far as the evidence discloses, either advise, request, or encourage the defendant to do the act. We think the jury was sufficiently cautioned with regard to the effect they were to give her testimony.

The next ground of exception is the refusal of the court to charge the jury as requested by defendant's counsel. Counsel contend that these requests presented relevant and material questions for the consideration of the jury as a matter of law under the evidence. As we have shown, the instructions of the court to the jury were full, fair, and correct on every particular phase of the testimony offered in the case, so far as the defendant had the right to demand such instructions. We have, however, pointed out one error in the charge given, but that was not a prejudicial error, because defendant was not entitled to the benefit of the defense or protection of the statute on the subject of homicide in self-defense. We have also considered the alleged error of the court below in refusing to charge the jury in the third, fourth, and fifth degrees of murder, as defined by our statute. As to this claim of error, we need only say that inasmuch as the court properly charged the law of murder in the first and second degrees, and the evidence before the court not warranting an instruction at all in the third, fourth, or fifth degrees, there was no error in refusing the request made by defendant's counsel for further instructions. Such part of these requests by the defendant as properly state the law, were covered by and embodied in the charge by the court. It is not error to refuse to give an instruction, when other instructions are given whereby the law applicable to the facts has already been fairly stated. When a legal principle has once been announced in an instruction, there is no necessity for its repetition, and it is no error to refuse to give it in a second instruction; nor is it error to refuse an instruction when there is no evidence tending to

support the hypothesis upon which it is based. *Murphy* v. *People*, 37 Ill. 447. Where the charge given by the court substantially covers the same ground, it is unnecessary to repeat such instructions on the request of defendant. *State* v. *Hockenberry*, 11 Iowa, 269. See, also, *State* v. *Knight*, 43 Me. 11.

A further objection is made on account of the neglect of the court to mark the instructions "given" or "refused." The bill of exceptions contains the following: "That the judge erred in not marking on the margin of each instruction asked for, 'given' or 'refused,' but added at the bottom of the last page: 'The foregoing are all refused,—some because they are embraced within those given by the court; others because they are believed to not accurately state the law.'" But to the omission of the judge to so mark "given" or "refused," and to make his statement in a general way, no objection was ever made or exception taken until after the jury retired. Counsel for defendant never asked further to examine the indorsements on the points thus presented, or objected or excepted to any action of the court respecting the manner in which its action was indorsed on or omitted from the points, until after the jury had retired, when counsel for defendant asked what the court did with said points, and the court remarked, so far as they were the law, they were included in the court's instructions. The counsel for defendant had full opportunity to ascertain and object to the action of the court before the jury retired, in the particular named. Section 2197, Comp. Laws, 1884; *Territory* v. *O'Donnell*, 12 Pac. Rep. 743,[1] (decided at this term.) The principal object of the statute requiring the judge to mark on the instructions "given" or "refused" was to avoid any subsequent dispute or doubt as to what instructions were given. In this case the instructions were refused, and so marked by the judge, with the statement of the grounds for the refusal. This, we think, was a substantial compliance with the statute, and fully answered its purpose. The defendant was in no manner prejudiced by the action of the court. No objection or exception having been taken at the time, it was too late to make such alleged error available after the retirement of the jury. *Cook* v. *Hunt*, 24 Ill. 535. See, also, *Territory* v. *O'Donnell, supra,* in which the time at which exceptions must be taken to be available was fully discussed.

The objection that the juror Jose Perida was not a citizen of the United States was not made until after the verdict, and came too late. The defendant had opportunity to ascertain the fact before the jury was accepted and sworn. He had an opportunity to make the inquiry, and thereby ascertain whether or not he was a citizen, and, if not a citizen, it was good ground for challenge for cause. The question raised by this objection has been fully considered at the present term in the case of *Anderson* v. *Territory, ante*, 108.[2] See, also, *Territory* v. *Abeita*, 1 N. M. 546; *Territory* v. *Yarberry*, 2 N. M. 451; and cases cited in *Anderson* v. *Territory, supra.*

Finding no prejudicial error in the record, the judgment of the court below is affirmed.

I concur: BRINKER, J.

### NOTE.

JUSTIFIABLE HOMICIDE—CIRCUMSTANCES THAT JUSTIFY A KILLING. It has been held that an assault with the fist only will justify the killing of the assailant with a pistol, if the assault is violent, and leads the person attacked to believe that he is in imminent danger of receiving additional serious bodily injury. High v. State, (Tex.) 10 S. W. Rep. 238. One not at fault in bringing about the difficulty may repel force by force, and when attacked with a deadly weapon is not bound to retreat, but may pursue his adversary until he finds himself out of danger; and if in such conflict he kills his adversary, the killing will be justifiable. State v. Murrell, (S. C.) 11 S. E. Rep. 682. Where two persons are in a room together, and one attempts to draw his pistol to shoot the other, but has difficulty in getting it out of his pocket, and while making the attempt retreats slowly towards the door, the other is justified in shooting him notwithstanding his retreat. Luckenbill v. State, (Ark.) 11 S. W. Rep. 963. Where one commences a search for his enemy, intending to do him serious injury, but before

[1] Same case, *ante*, 66.    [2] Same case, 13 Pac. Rep. 21.

finding him abandons the plan, and in good faith endeavors to avoid a difficulty, which is forced upon him by his adversary, his right of self-defense revives, and he may lawfully kill his assailant, who threatens him with the infliction of great bodily injury. Crane v. Com., (Ky.) 13 S. W. Rep. 1079. So where defendant actually makes the first assault, but after disarming his antagonist withdraws from the combat, while the latter goes into another building, from which, after the lapse of several minutes, he returns towards defendant at a rapid gait, with a threatening manner, and is killed in the ensuing collision, the plea of self-defense is permissible, as the conflict cannot be regarded as one continuous affray. Brazzil v. State, (Tex.) 13 S. W. Rep. 1006; Parker v. State, (Ala.) 7 South. Rep. 98. So, when defendant, after having brought on the fight, in good faith endeavors to decline any further struggle, the killing may be justified. People v. Bush, (Cal.) 3 Pac. Rep. 590. The fact that a person induces an assault upon himself by insinuating to the aggressor that he has been guilty of a crime does not deprive him of his right of self-defense, provided that the accusation was not made for the purpose of inviting an attack. Gonzales v. State, (Tex.) 12 S. W. Rep. 733. A person who takes the life of another in self-defense must actually believe that he is in imminent danger of losing his own life or of receiving serious bodily harm, and the circumstances must be such as in the opinion of the jury would justify a reasonable person of ordinary firmness and discretion in entertaining such belief. State v. Jackson, (S. C.) 10 S. E. Rep. 769. Where a person has reason to believe, and does believe, that he is in danger of his life or of great bodily injury, he is justified in killing his assailant, though it turns out that the appearances were false, and there was no actual danger. State v. Evans, (W. Va.) 10 S. E. Rep. 792; Brown v. Commonwealth, (Va.) 10 S. E. Rep. 745; Nalley v. State, (Tex.) 13 S. W. Rep. 670; Cochran v. State, (Tex.) 13 S. W. Rep. 651. In the famous Neagle Case, 10 Sup. Ct. Rep. 658, it was decided that the prior threats by Judge Terry to kill Justice Field on sight, coupled with the known vindictiveness of his disposition, justified Deputy-Marshal Neagle in shooting Terry when the latter slapped the justice in the face, and then made a motion as if to draw a weapon. But usually threats of violence made several days before the conflict do not justify the person threatened in taking the life of his adversary at sight, unless the threats are then renewed, or there is some demonstration of violence. State v. Jackson, supra; Price v. People, (Ill.) 23 N. E. Rep. 639. See, also, People v. Adams, (Cal.) 24 Pac. Rep. 629; Brinkley v. State, (Ala.) 8 South. Rep. 22; People v. Robertson, (Cal.) 8 Pac. Rep. 600; People v. Scott, (Cal.) 10 Pac. Rep. 188; Oakley v. Com., (Ky.) 11 S. W. Rep. 72; Barnard v. State, (Tenn.) 12 S. W. Rep. 431; Kelley v. State, (Tex.) 11 S. W. Rep. 627.